UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JAMES DOE,                                                :

              Plaintiff,                            :

           -against-                              :

CORNELL UNIVERSITY, ELIZABETH MCGRATH,  :
as agent for Cornell University, and
JODY KUNK-CZAPLICKI, as agent for Cornell      :
University,                                              :
                                                         :
             Defendants.                           :

------------------------------------------------------------------X

**Civil Action No:**  3:17-cv-402 (GTS/DEP)

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff James Doe [1] (hereinafter referred to as "Plaintiff" or "James Doe"), by his

attorneys Nesenoff & Miltenberg, LLP and Shaw & Murphy, PLLC, as and for his Complaint,

respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     This case arises out of the actions taken and procedures employed by Defendants

Cornell University, Elizabeth McGrath and Jody Kunk-Czaplicki ("Defendants") in investigating

and adjudicating: (i) a complaint of sexual misconduct filed by James Doe against Sally Roe; (ii)

a complaint of non-sexual misconduct filed by James Doe against Sally Roe, (the "Complaints");

(iii) a false allegation of sexual misconduct filed by Sally Roe  against James Doe; and (iv) a

false complaint of non-sexual misconduct filed by Sally Roe against James Doe (the "Cross-

Complaints"). The Complaints and Cross-Complaints alleging sexual misconduct and non-sexual

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.

1

misconduct arose out of a sexual encounter between James Doe and Sally Roe that occurred in the early morning hours of September 18, 2015.

2.      Throughout the investigation of the Complaints and Cross-Complaints, Defendants engaged in substantial procedural errors in violation of the University's own policies, as well as state and federal law when they deprived James Doe of a hearing, including the right to present his case before an impartial panel and to cross-examine witnesses and challenge his accuser, and demonstrated a gender bias against Plaintiff as both the male complaining party and the male student accused of sexual and non-sexual misconduct, resulting in erroneous outcomes and an unwarranted sanction.

3.      As a result of Defendants' actions and inactions, James Doe has suffered physical, psychological, emotional and reputational damages and economic injuries and the loss and/or delay of educational and career opportunities.

4.      As a result of Defendants' actions and inactions, to date James Doe has been rejected by several top tier graduate schools applied to; he will graduate with a 3.72 GPA instead of the 3.84 he maintained through the fall 2015 semester when the investigation began, directly precluding him from applying to academic honors, scholarships and fellowships that require a 3.8 GPA for University endorsement; the decrease in GPA that Plaintiff experienced as a result of Cornell's actions significantly lowered his chances of gaining admission to a top tier Physics graduate school; he was restricted from facilities and opportunities on campus; and the excessively delayed investigation took time away from James Doe that he otherwise could have dedicated to his studies, teaching and research experience.

5.      Defendants conducted a fatally flawed proceeding, afflicted by an anti-male discriminatory bias, and resulting in erroneous outcomes and severe and unwarranted damages to

Plaintiff. Accordingly, Plaintiff brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process, breach of contract and other state law causes of action, including violation of the New York State Education Law § 6444(5).

## THE PARTIES

6.      Plaintiff James Doe is a natural person and resident of the State of Alaska. At all relevant times herein, Plaintiff was a student at Cornell University and resided in his fraternity house on Cornell's campus. James Doe presently lives in Ithaca, New York.

7.      Defendant Cornell University ("Cornell" or the "University") is a private Ivy League institution and federal land-grant doctoral university located in Ithaca, New York. The University is organized into seven undergraduate colleges, three of which are public, state-supported statutory or contract colleges through the State University of New York (SUNY) system, and seven graduate divisions.

8.      Upon information and belief, Elizabeth McGrath ("McGrath") is a resident of the State of New York and was Lead Title IX Coordinator at Cornell until she was replaced by Sarah Affel in or around April 2016.

9.      Upon information and belief, Jody Kunk-Czaplicki ("Kunk-Czaplicki") is a resident of the State of New York and was the Interim Judicial Administrator at Cornell until she was replaced by Michelle Horvath in or around June 2016.

## JURISDICTION AND VENUE

10.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are

residents of different states; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendant Cornell University on the grounds that it is conducting business within the State of New York.

12.     This Court has personal jurisdiction over Defendant McGrath on the grounds that she was an employee of Cornell at all relevant times herein, and personally violated certain laws, rights and policies.

13.     This Court has personal jurisdiction over Defendant Kunk-Czaplicki on the grounds that she was an employee of Cornell at all relevant times herein, and personally violated certain laws, rights and policies.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      Agreements, Representations, Covenants &
        Warranties Between Plaintiff and Cornell**

14.     Plaintiff grew up in Waverly, Ohio and Anchorage, Alaska.  Plaintiff's father is a retired Army doctor, awarded the Legion of Merit for his service in the military, and his mother is a trained nurse. Plaintiff's parents currently reside in Bethel, Alaska, where they work in service to Native Alaskans in rural Alaska.

15.     In May of 2013, Plaintiff graduated from West Anchorage High School with a GPA of 4.36 on a 4.0 scale, which earned him placement at second in his class. He graduated with roughly 150% of the required credit hours for graduation and simultaneously earned an International Baccalaureate degree which required 50 hours of community service. He was active in the school symphony and school theatre and became an Eagle Scout where he started a child

identification program at his church to assist law enforcement in combating child abduction/child abuse in the community.

16.    Prior to September 2015, Plaintiff never had any disciplinary problems, whether at Cornell or at any other academic institution.

17.    Plaintiff is currently a Senior at Cornell, enrolled in the College of Arts and Sciences and expects to graduate in May, 2017.

18.    Plaintiff's interests include ballroom dancing, he is a member of the Society of Physics Students, an Eagle Scout, and a member of the Theta Delta Chi fraternity.

19.    Upon matriculating as a freshman at another institution in the fall of 2013, Plaintiff completed an online course, a lecture-based information session and an open discussion seminar on consent and sexual violence.

20.    In the spring of 2015, Plaintiff attended an interactive sensitivity training session on consent and sexual violence with his fraternity house at Cornell that further informed him on the topics of consent and sexual violence.

21.    In 2014, Plaintiff was licensed by the U.S. Nuclear Regulatory Commission to operate a TRIGA Mark 1 nuclear reactor.

22.    While at Cornell, Plaintiff has maintained a 3.72 grade point average while double majoring in Mathematics and Physics.

23.    Each semester, his professors approved an accelerated curriculum for Plaintiff, of over 20 class hours per week, though only 12 credits were necessary to be considered a full-time student.

24.    Despite this grueling schedule, Plaintiff also worked as a teaching assistant and research assistant.

25.     Prior to becoming the victim of unlawful, targeted, biased, arbitrary and capricious disciplinary actions at the hands of Cornell administrators, Plaintiff had a spotless academic record and a stellar reputation in the Cornell community.

26.     Upon his acceptance to Cornell, James Doe was provided online access to copies of Cornell's school policies, including the Campus Code of Conduct (the "Code"), as amended on September 26, 2014 (attached hereto as Exhibit 1) and Policy 6.4 (attached hereto as Exhibit 2), which has since been amended (collectively, the "Policies").

27.     Notably, Cornell revised its Policy 6.4 effective August 1, 2016 (the "Revised Policy 6.4") (attached hereto as Exhibit 3). As discussed in further detail below, the Revised Policy 6.4, inapplicable to the current case, now affords greater fundamental protections to students accused of misconduct.

28.     These Policies set forth the procedures by which Cornell students who have been accused of violating one or more of the enumerated Policies are investigated, heard, and, possibly, disciplined.

29.     Upon information and belief, in April of 2012, former President David Skorton accepted the recommendation of the University Assembly that investigations into allegations of sexual assault and sexual harassment by students be transferred from the Campus Code of Conduct to a modified version of University Policy 6.4, which previously handled only faculty, staff and student-employee cases.

30.     Some opponents of the change expressed concern that while this shift may encourage more students to file complaints, it could also result in more students being falsely accused or found in violation of the policy.

6

## II.     Cornell's Inconsistent Disciplinary Policies

31.     Cornell's Campus Code of Conduct and Policy 6.4, effective during the 2015-2016 academic year, provide inconsistent and irreconcilable procedures to students accused of misconduct, depending on the type of misconduct alleged.

32.     Policy 6.4 substantially limits an accused student's fundamental rights during the investigative process, notwithstanding the oftentimes more serious nature of the charges considered under this policy; namely, sexual misconduct, including assault and rape.

33.     Specifically, Cornell's Code of Conduct provides the following non-exhaustive rights to a student accused of sexual misconduct:

- The right to a hearing before a hearing panel composed in part of fellow students;

- The right to have evidence examined under a clear and convincing standard of proof;

- The right to question witnesses; and

- The right to confront one's accuser.

34.     Significantly, none of the foregoing procedural guarantees are explicitly afforded to a student accused of sexual misconduct under Policy 6.4.

35.     Instead, Policy 6.4 utilized the single-investigator model, which effectively nullified Plaintiff's right to defend himself against allegations of misconduct.

36.     Contrarily, Appendix C to Policy 6.4 parallels the Code of Conduct, affording faculty members at Cornell the right to a formal hearing before an impartial panel, the right to present witnesses and evidence on his or her own behalf and the right to confront and cross-examine adverse witnesses. *See* Exhibit 2, Appendix C.

7

37.     Moreover, Appendix C provides that complaints against faculty and staff members will be evaluated under the "clear and convincing evidence" standard, making the burden of proof much higher, and the likelihood of reaching an erroneous finding of responsibility lower, than sexual misconduct complaints brought against Cornell students.

38.     While Cornell had the ability to adopt and enforce the requisite level of due process in disciplinary proceedings, as demonstrated by its implementation of both the Code of Conduct and Policy 6.4 Appendix C, it instead chose to pursue the sexual misconduct complaints filed in this case under a flawed system that denies the accused students of some of the most basic procedural protections. *See* Exhibit 2, Appendix C.

### A.   The Code of Conduct Affords a Responding Student a Hearing.

39.     The following actions constitute a violation of Title III of Cornell's Code of Conduct, among others:

a.   To (1) rape, (2) sexually assault, or (3) sexually abuse another person, as those terms are defined in Cornell University Policy 6.4.[2]

c.   To harass another person in a manner that would violate Cornell University Policy 6.4 if it were applicable.

g.   To (1) endanger another person, including but not limited to such acts as: introducing a weapon into a fight, whether or not the weapon was used; using one's body parts as a weapon; violation of Life Safety regulations; theft or use of fire extinguishers; use of firecrackers or flares; or any other acts, whether reckless or intentional, that create a dangerous situation for the safety of another individual (2) threaten or use physical force or violence to endanger, injure, abuse, intimidate or coerce another person. Ex. 1, Title III, Art. II.A.1, at p. 16.

---

[2]  Despite this reference, the Code of Conduct contains an Appendix A which states "[o]ffenses involving sexual violence and sexual harassment, while still violations of the Campus Code of Conduct, will be investigated and adjudicated under Policy 6.4 until such time as the Code is amended to fulfill requirements of Title IX."  As discussed herein, the Code of Conduct appears far more compliant with the requirements of Title IX than Policy 6.4.

40.     When a student is accused of any of these violations, Cornell's Office of the Judicial Administrator ("OJA") is required to "promptly cause an investigation to be made." Ex. 1, Code of Conduct Title III, Art. III.A.1. at p. 19.  In addition, "the Judicial Administrator shall determine, *without undue delay*, whether to offer a summary decision, to file formal charges, or to take no action." *Id.* Art. III.C.1, at p. 21 (emphasis added).

41.     In the case of formal charges, a hearing will be conducted under the Code of Conduct. During this proceeding, "no accused person shall be denied the opportunity to question witnesses or to confront his or her accusers." *Id.* Art. III.E. at p. 28.

42.     However, "to avoid the risk of intimidation in cases of sexual harassment, abuse, assault, or rape, the Hearing Board Chair shall require cross-examination of the complainant or victim to be conducted by written questions." *Id.*

43.     Under the Code of Conduct, "[i]f an individual complainant does not testify, the Hearing Panel may proceed to decision only if it finds that the complainant's interests in not testifying outweigh the accused interest in confronting his or her accuser." *Id.*  Moreover, the "accused can prevent the introduction of any written, recorded or oral account of an earlier statement by a nontestifying complainant." *Id.*

44.     Under the Code of Conduct "[n]o accused person shall be denied the right to present evidence or witnesses in his or her own behalf." *Id.*  "No accused person shall be compelled to testify against himself or herself.  The hearing can proceed even if he or she chooses to remain silent." *Id.*

45.     Plaintiff was first accused of violating the Code of Conduct in September 2015. In October 2015, he filed a complaint for violations of the Code by Sally Roe. Had those

complaints been promptly pursued, Plaintiff would have been afforded the panoply of rights, outlined *supra*, including the right to a hearing.

46.   Instead, the OJA failed to complete its investigation, or bring charges until compelled to do so by the Supreme Court of the State of New York more than 12 months later, while pursuing only the complaint against Plaintiff filed under its violative Policy 6.4, which deprives students accused of misconduct of their most fundamental rights.

47.   Notwithstanding that the Code provides for a hearing, Defendants intentionally and maliciously acted to deprive Plaintiff of any hearing whatsoever, as explained in more detail below, in violation of the Code of Conduct.

48.   Given the OJA's approach, Plaintiff was deprived of the rights that are mandated by the Code of Conduct, including the right to a hearing.

### B. Policy 6.4 Adheres to A Single Investigator Model and Does Not Entitle the Accused to a Hearing.

49.   Cornell adopted Policy 6.4 in February 2012, in response to the U.S. Department of Education's "Dear Colleague Letter" to address instances of sexual assault and sexual harassment. *See* Exhibit 3, Cornell University School of Law, *Annual Report of the Judicial Codes Counselor, Academic Year 2013-2014*, at p. 18 (hereinafter "JCC Report").

50.   Policy 6.4 is appended to Cornell's Code of Conduct and addresses Cornell's obligations under Title IX of the Education Amendments of 1972. *Id.*

51.   Policy 6.4 broadly defines "sexual violence" as "physical acts perpetrated without affirmative consent or when a person is incapable of giving affirmative consent.  A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. All such acts of sexual violence are forms of sexual harassment that are covered under Title IX." Ex. 2, at p. 11.

10

52.     Policy 6.4 employs a single investigator model, which allows one individual to act as judge, jury and executioner, and does not provide for a hearing. *Id.* at pp. 22-25.

53.     Under the single investigator model, Cornell appoints an individual investigator (the "Title IX Investigator") who is responsible for conducting an investigation into allegations of sexual misconduct, making findings of fact, and recommending corrective action.

54.     The Title IX Investigator is supposed to complete the investigation within 60 days, unless good cause is shown for an extension. *Id.* at p. 22.

55.     Policy 6.4 explicitly denies an accused of his fundamental rights to fair process, stating: "Adversarial hearings (including confrontation, cross-examination by the parties, and active advocacy by attorneys) are not permitted during the investigation process." *Id.* at p. 22.

56.     After completion of the investigation, the Title IX Investigator "must produce a written report, which must include…the scope of the investigation, a [s]ummary of the findings, [r]ecommendations for any corrective actions and/or sanctions, [a]ny non-putative, [p]reventative remedies for the complainant, [and] [i]f warranted, a recommended action to restore the accused's reputation." *Id.* at p. 23.

57.     The Title IX Investigator sends this report to a three-person review panel, made up of three faculty members, which then decides the fate of the accused. Notably, no hearing or taking of live testimony occurs before the review panel considers the outcome. *Id.* at 23-34. Contrarily, the Code provides for a five-person review panel, composed of three students, one faculty member and one non-faculty employee.

### III.     New York State Education Law Mandates a Hearing

58.     On July 7, 2015, the New York State Legislature passed Section 6444(5) which became effective on October 5, 2015.

11

59.    Section 6444(5) was passed, *inter alia*, to provide a fair and consistent administrative process to students in higher education accused of sexual assault, domestic violence, dating violence or stalking.

60.    Section 6444(5) provides students accused of sexual assault, domestic violence, dating violence or stalking with the "right to a process in all student judicial conduct cases…that includes, *at a minimum*…an opportunity to … present evidence and testimony at a hearing, where appropriate, and have access to a full and fair record of any such hearing."

61.    Section 6444(5) also mandates that the accused has a right to "a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely and thorough manner by individuals who receive annual training in conducting investigations of sexual violence…including the right to a presumption that the respondent is 'not responsible.'"

62.    Section 6444(5) further requires an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest."

### IV.    Cornell's Judicial Codes Counselor Sheds Light on its Broken Disciplinary System

63.    Significantly, mere months before Plaintiff's case was initiated, Cornell's Judicial Codes Counselor (the "JCC"), which has the responsibility of defending Cornell students accused of misconduct, issued a scathing annual report which indicates that Cornell's disciplinary process was rife with serious problems.

64.    The JCC Report notes the prosecutorial stance of the OJA (which is purportedly impartial) in dealing with male students accused of sexual misconduct; the bias and narrow-mindedness of Cornell's primarily female force of Title IX investigators; and the inability of students accused under Policy 6.4 to receive a fair hearing.

65.   The JCC Report further noted a discrepancy between the disciplinary process provided for in Cornell's Code of Conduct and that outlined in Policy 6.4.

66.   Specifically, the JCC Report detailed the flaws in Cornell's Policy 6.4, noting: "the most deploring characteristics of investigations [under Policy 6.4] against students is their duration. On average, it takes the JA's office about five months (seven months including appeals) to complete a Title IX investigation, exceeding the federally-recommended timeline by three months. In some cases, it took ten months or longer." *JCC Report,* p. 2.

67.   The JCC Report further observes, "[a]s it appears in Cornell's sexual assault policy, temporary suspension may be imposed according to a lower standard than in the Code. This fact could encourage administrative policy-shopping where the JA decides how to characterize misconduct and may also desire greater discretion to use interim measures like temporary suspension." *Id.*

68.   In addition, "the JA admits…it is often difficult to determine whether alleged misconduct should be investigated under Policy 6.4 or the Code of Conduct.  Rights for the accused under the Code of Conduct are completely different than those under Policy 6.4 and the respondent, arguably, has a better chance of prevailing under the Code…Thus, the policy through which alleged misconduct is investigated and adjudicated may very well be outcome determinative." *Id.* at p. 71.

69.   Regarding complaints against the accused, the JCC Report states "[s]ometimes, the accused is unaware of the charges he faces until the first JA interview…[i]n a few recent cases, JCC clients did not receive notice of *any* allegations before meeting with the JA.  In a few cases, the JA Office sent emails requesting 'witness' testimony.  These clients were surprised to learn of the charges against them and were unprepared to defend themselves…The Code

explicitly requires the JA to notify all interviewees of the 'matter' and their 'relation to it' before any interview takes place." *Id.* at p. 11.

70.     Regarding timeliness under the Code of Conduct, the JCC Report states "[t]he Code recognizes that 'timely dealing with alleged misconduct is vital'…Accused parties often experience tremendous anxiety while cases are pending.  During the reporting period, some JCC cases were open for unreasonable time periods, such as for the majority of the academic year." *Id.* at p. 12.

71.     A troubling observation made by the JCC about Policy 6.4 is that "in its effort to swiftly revise its procedures and crack down on sexual misconduct, Cornell has implemented policy far beyond what is necessary to comply with OCR's guidance and created a process fraught with inequities. *Id.* at p. 18.  "The guidance itself is not law.  Nor is it a regulation." *Id.* at p. 20.

72.     The JCC Report further notes a troubling development in Cornell's investigation of cases under Policy 6.4.  In one case, "[t]he investigator based her finding of guilt entirely on the perceived credibility of the parties.  The investigator determined that the complainant was the most credible…What is curious about this particular case is that, after assessing the credibility of the parties according to an entirely subjective standard, the JA treated the *intuition* of the most credible party as *evidence*." *Id.* at 20 n. 73.

73.     Even more troubling is the JCC's conclusion that "[t]he structure of the 6.4 process itself *reduces the likelihood of an outcome favorable to the accused*." *Id.* at p. 24 (emphasis added).  This is because, in the words of the JCC, "The JA office is not an impartial environment." *Id.*

74.     Notably, "[t]he requirement for a student to appear in the JA office indicates that, in the absence of additional information, there is already enough evidence to charge the student with a Code violation. When a JA associate meets with a student, the climate is inherently adversarial." *Id.* Further, "OCR guidance requires that a school's Title IX investigations 'must be adequate, reliable, *impartial*, and prompt.' Where the organizational psychology of an office is prosecutorial, it is impossible to claim that it provides an impartial atmosphere." *Id.*

75.     Also troubling is the JCC's note concerning Cornell's lack of male Title IX investigators. "Title IX claims are…investigated overwhelmingly, if not entirely, by women. Because respondents in 6.4 cases are usually men, this dynamic is troubling. Respondents often feel uncomfortable in an interview room of only women…which invariably affects body language and demeanor…If a respondent's nervous behavior is misinterpreted, it may adversely affect his credibility rating." *Id.* at p. 36

76.     According to the JCC, Policy 6.4 has also unnecessarily eradicated the rights of students accused of sexual misconduct in several ways. *Id.*

77.     Per the JCC, "[n]o one may appear in person before the panel, precluding its direct evaluation of the credibility and demeanor of every witness involved in the case. Because the investigator, is the only person who directly contacts the parties and witnesses, the panel relies on her impressions, and typically affords them great deference." *Id.* at p. 25.

78.     "Overlay onto this situation the skimpy preponderance standard, and the investigator is situated to decide cases based on her gut feelings. When that investigator is a JA employee whose prosecutorial position may influence her judgment, a biased perspective disadvantages the respondent. *Deprived of the opportunity to present a defense to the actual*

*adjudicator, the accused doesn't have the option to expose his character to the panel or to answer questions that could lead to his exoneration."* *Id.* (emphasis added).

79.     The JCC Report further emphasizes that "[n]othing in OCR guidance requires a prohibition on appearing before the adjudicator in person.   Rather, OCR's guidance is replete with references to a 'hearing,' indicating that a procedure in which parties and witness appear before the adjudicating authority is acceptable." *Id.*

80.     Policy 6.4 further removes an accused's right to confront his accuser, "6.4 lacks positive language to protect the right of both parties to question each other through the investigator.  The investigator ultimately determines what will and what will not be asked, and she is free to dismiss requests for interrogatives that, in her opinion, are not probative.   The accused thus faces another obstacle to his case." *Id.*

81.     Policy 6.4 also prohibits the parties from questioning third party witnesses.  "The investigator, again, has control over every line of questioning and has the authority to decline requests (which are not even permitted in the policy) from the parties for specific interrogatives. Any misstep or bias on the part of this single individual can therefore ultimately shape the course of the investigation and determine the final outcome of the case." *Id.* at p. 28.

82.     Policy 6.4 also prohibits parties from viewing the original evidence or hearing the direct testimony of the opposing party. *Id.*

83.     Plaintiff's case is an exemplar of Cornell discipline gone wrong as it mirrors the numerous problems outlined in the JCC Report.

84.     On October 21, 2015, Cornell officials conceded the flaws in Policy 6.4 and announced that the University was working to revise the policy.

85.     Among the proposed changes was moving to a hearing model and prohibiting a single investigator from making factual findings or recommendations.  Exhibit 4, Cornell Daily Sun, October 21, 2015, *University's Policy 6.4 Mandates See Progress After New State Mandates*.

## V.     Cornell's Revised Policy 6.4

86.     On or about August 1, 2016, Cornell adopted a revised Policy 6.4 governing the investigation and adjudication of sexual misconduct complaints. The new Policy 6.4 differs from the previous policy, which was in effect at the time of Plaintiff's case, in several significant respects, including:

a. All students accused of sexual misconduct are now afforded the right to a hearing before a three (3) member hearing panel. The new Policy 6.4 states: "The hearing is intended to provide the parties with a fair opportunity to present relevant information to the Hearing Panel and enable the Hearing Panel to make informed decisions regarding responsibility and sanctions/remedies." *See Exhibit C*, p. 28.

b. Both parties are afforded the right to question witnesses at the hearing. *See Exhibit C*, p. 30.

c. The investigator's role is now limited to gathering evidence and producing an investigatory report for the hearing panel; the investigator is no longer permitted to give recommendations or opinions regarding responsibility. *See Exhibit C*, p. 23.

d. The revised policy specifies the scope of evidence to be gathered by the investigator which consists of: "relevant available evidentiary materials, including

17

physical evidence, documents, communications between the parties, and other electronic records and media as appropriate." *See Exhibit C*, p. 23.

e.  The revised policy guarantees that a respondent will be promptly informed "of any actions that will directly impact the respondent, including the filing of a Formal Complaint or the imposition of Interim Measures that would directly impact the respondent, and provide an opportunity for the respondent to respond to such action(s)." Further, "[u]pon issuance of a Formal Complaint, The Title IX Coordinator will provide both parties with a copy of the Formal Complaint, Policy 6.4, these procedures and written notices as set forth in [this section]." Significantly, the Policy 6.4 in place at the time of Plaintiff's case only provided for notice that an accused had been named in a complaint. *See Exhibit C*, p. 14.

f.  The revised policy guarantees that the investigation "is designed to be timely, thorough, and impartial and provide for a fair and reliable gathering of the facts." *See Exhibit C*, p. 23.

g.  The revised policy provides a more comprehensive and fact specific standard for determining whether an interim suspension is appropriate. While the prior policy simply noted "the JA may impose interim measures to protect the safety and well-being of members of the university community," the revised policy notes that interim suspension may only be imposed in "extraordinary circumstances" and "when less restrictive Interim Measures are deemed insufficient to protect the complainant or University community." Factors to be considered under the revised policy include: (i) whether the respondent has a history of violent behavior or is a repeat offender; (ii) whether the incident represents escalation in

18

unlawful conduct; (iii) whether there are facts indicating a risk that the respondent will commit additional acts of violence; and (iv) whether the respondent used a weapon or force. *See Exhibit C, p.* 18.

87.     Notably, Plaintiff was denied the foregoing fundamental rights during the investigation and adjudication of the Complaints and Cross-Complaints under the previous Policy 6.4.

### VI.     The Night of September 17-18, 2015 (the "Incident")

88.     The evening began around 9:00 p.m. with Plaintiff working on his quantum mechanics homework. After completing the assignment, he went downstairs in the fraternity house where he resided to have a drink with his friends.

89.     There, he met Sally Roe, who was a friend of one of the brothers in the house. Sally Roe walked up to him and they introduced themselves to one another. They began talking and discovered that they had some things in common.

90.     Thereafter, James Doe and Sally Roe engaged in a few games of foosball before deciding to go to a party in Collegetown. James Doe, Sally Roe and two other friends walked to Collegetown, arriving to the party at approximately midnight. Though they had consumed some alcohol at the fraternity house, it was undisputed that none of them were intoxicated.

91.     Upon noticing a larger party being held next door, the four friends decided to go over there instead. Once they arrived, Sally Roe asked Plaintiff to make her a drink, but he declined and she made her own drink. When she didn't finish the drink, Plaintiff and A.S. finished it instead, at her request.

92.     At approximately 12:45, the four friends left the party and began to walk back towards the house. During the walk, Sally Roe asked for Plaintiff's number; Sally Roe then texted him her phone number.

93.     Upon arriving back to the house, Sally Roe indicated that she did not want to go back to her room and asked if she could come inside James Doe's fraternity house. A.S. agreed and let her inside.

94.     Once inside the house, Sally Roe asked James Doe for a drink. He offered the use of a bar table that was in his room and she agreed, so they mutually went up to James Doe's room where he made her a non-alcoholic beverage.

95.     Sally Roe subsequently crawled up onto James Doe's bed, on her own volition and without any prompting from James Doe. She lay down on his bed and smiled, inviting Plaintiff to join her, which he did.

96.     They moved closer together and mutually began to kiss. As Sally Roe began to kiss him more aggressively, she pushed him onto his back, making him feel uncomfortable.

97.     After they each removed their own shirts, Sally Roe grabbed Plaintiff by the wrists, pinned him down and climbed on top of him. Plaintiff attempted to get her off of him by rolling her to his side, in an attempt to prevent the situation from becoming awkward.

98.     However, when Sally Roe repeatedly pushed him onto his back, pinned him down by his wrists and straddled him, James Doe became increasingly uncomfortable. Unbeknownst to Sally Roe, Plaintiff had been sexually assaulted during his freshman year at another university. He did not report it at the time.

99.     Despite his protests and repeated requests that she stop this dominating behavior, Sally Roe told him "no", in response to his requests that she stop her advances.

20

100.    At no point did she ask whether James Doe consented to this sexual activity or her sexual advances.

101.    Eventually, James Doe was left with no option but to physically remove Sally Roe, to prevent her from taking advantage of him. James Doe tried to tell Sally Roe that he wanted her to slow down and be more gentle, as he placed one hand on her back and one hand on her collarbone, gently pressing her off of him, but being careful not to push her all the way off out of concern that she could fall back and hit her head on the corner of the bar table.

102.    Almost instantaneously, Sally Roe punched him in the testicles, causing residual pain that would last for weeks thereafter and cause him to seek medical evaluation.

103.    Sally Roe left James Doe's room at approximately 2:00 a.m., at which point James Doe tried to ignore the pain and go to sleep.

104.    Later that morning, at around 8:40 a.m., James Doe reached out to Sally Roe by text message in an attempt to informally resolve the conflict between them. This text message exchange did not prove productive and the parties did not speak or text again thereafter.

105.    The following day, on Saturday September 19, 2015, Plaintiff learned from the president of his fraternity that Sally Roe was alleging James Doe had choked and tried to rape Sally Roe during their encounter.

### A.  Plaintiff Receives a Temporary Suspension Without the Opportunity to Tell His Side of the Story.

106.    Demonstrating the procedural flaws recognized by the JCC Report, Plaintiff was denied any opportunity to be heard prior to the issuance of an interim penalty.

107.    On September 23, 2015, Sally Roe met with investigator McGrath and co-investigator Covington (the "Investigators") for her first interview concerning the events of September 18, 2015.

108.    No police report was filed and Sally Roe reported no injuries.

109.    Sally Roe and Plaintiff did not have sexual intercourse and neither party was alleged to be intoxicated.

110.    Two days later, on September 25, 2015 at 2:19 p.m., the OJA sent an email to Plaintiff with the simple subject line "meet today." The email requested that Plaintiff meet with the OJA approximately one hour later, at 3:30 p.m. Yet, this email from the OJA neither informed Plaintiff of the reason for the meeting nor notified him of the exact allegations against him.

111.    As Plaintiff unknowingly received the email while in route from his Spanish Class to his Physics lab, he did not see the email. He was subsequently in Physics lab until well after 5:00 p.m., with his phone on "airplane mode." Accordingly, he did not see the email from the OJA prior to returning to his room at the fraternity house at about 5:40 p.m.

112.    Upon returning to his room, Plaintiff checked his voicemail and found two voicemail messages from the OJA, which had called him from blocked phone numbers.

113.    He next received a phone call from attorney Bill Shaw, who, unbeknownst to Plaintiff, had been contacted by Plaintiff's fraternity after a Cornell University Police Department ("CUPD") officer showed up looking for Plaintiff at the fraternity house.

114.    Mr. Shaw then called the OJA office and learned from Interim Judicial Administrator, Jody Kunk-Czaplicki, that—prior to speaking with Plaintiff or hearing his side of the story—she was imposing a temporary suspension and *persona non-grata* order. She directed Plaintiff to appear at her office immediately to be served with the related documentation, notwithstanding that she still had not made Plaintiff aware of the charges against him.

115.    Consequently, rather than be detained and transported by police, Plaintiff and Mr. Shaw appeared at the OJA's office (the "September 25th Meeting"). When Kunk-Czaplicki met with Plaintiff and his counsel, she spoke to Plaintiff in an accusatory and intimidating manner, making it clear that her decision concerning his suspension was non-negotiable, notwithstanding that Plaintiff had not yet had an opportunity to present his account of the events, and Kunk-Czaplicki's investigation thus far consisted solely of interviews with hearsay witnesses.

116.    Kunk-Czaplicki encouraged Plaintiff to waive his right to remain silent despite his inability to confer with an attorney at any length prior to the meeting, much less his parents.

117.    Thus, Plaintiff declined to waive his right to remain silent, on advice of counsel, as it was clear that his suspension would not be stayed no matter what he said. His attorney did attempt to provide the OJA with certain key facts, as known to him, but to no avail.

118.    Plaintiff's attorney reasonably requested that Kunk-Czaplicki suspend her decision on the temporary suspension until Plaintiff conferred with counsel and was given an opportunity to make a statement; however, her decision had been made and she would not waver. In fact, Plaintiff's attorney offered to appear back at the OJA the very next morning, a Saturday, to provide such a statement. The 12 hours requested was to learn of any possible criminal charges and to consult with Plaintiff's parents, living in Alaska. Waiving a right to remain silent, without conferring with a client, could be cause for malpractice by an attorney, and he so advised Kunk-Czaplicki. Nonetheless, she denied the request, insisting instead that she would "consider" what he might say, but would not allow any delay, whatsoever.

119.    At the September 25th Meeting, Plaintiff also received and signed several documents, including a three-page, previously drafted and typed letter from Kunk-Czaplicki

outlining the terms of his temporary suspension (the "Suspension Letter") and Plaintiff's alleged violations of Cornell's Code of Conduct.

120.     According to the Suspension Letter, Plaintiff was not being charged but was being put on notice that he "may" have violated Cornell's Code of Conduct which makes it a violation:

    a.   To (1) rape, (2) sexually assault, or (3) sexually abuse another person, as those terms are defined in Cornell University Policy 6.4.

    c.   To harass another person in a manner that would violate Cornell University Policy 6.4 if it were applicable.

    g.   To (1) endanger another person, including but not limited to such acts as: introducing a weapon into a fight, whether or not the weapon was used; using one's body parts as a weapon; violation of Life Safety regulations; theft or use of fire extinguishers; use of firecrackers or flares; or any other acts, whether reckless or intentional, that create a dangerous situation for the safety of another individual; (2) threaten or use physical force or violence to endanger, injure, abuse, intimidate or coerce another person.

121.     The Suspension Letter outlined the allegations against Plaintiff which purported to justify his interim sanction, notwithstanding that Plaintiff had not yet been given an opportunity to present his account of the events.

122.     Significantly, there were no eyewitnesses to the Incident. As such, the OJA interviewed three of Sally Roe's friends who only learned of the Incident from speaking with Sally Roe herself after the fact, and thus served as mere receptacles for Sally Roe's version of events. Contrarily, upon information and belief, the OJA consulted with only one of Plaintiff's potential witnesses prior to issuing the Suspension Letter.

123.     Nonetheless, Kunk-Czaplicki was confident that Cornell had conducted a sufficiently adequate inquiry and invoked the OJA's power to suspend Plaintiff under both Policy 6.4 and Cornell's Code of Conduct.

124.   According to Kunk-Czaplicki, under Policy 6.4, "the JA may impose interim measures to protect the safety and well-being of members of the university community." *See* Exhibit 2, Policy 6.4, Subsection D at p. 18. "Due to the extraordinary circumstances alleged in this matter and for the purposes of assuring public order and safety, you are **temporarily suspended** from Cornell University." (emphasis in original).

125.   Kunk-Czaplicki's letter also notified Plaintiff that he had a right to a hearing concerning his suspension which "would not be a hearing on the merits of this case; as the investigation is ongoing."

126.   At the September 25th Meeting, Plaintiff received a form titled "The Campus Disciplinary System and Procedures for Accused Persons" on which was written one nearly illegible hand-written statement concerning the allegations against him.

127.   This form notified Plaintiff that he had: (i) the right to remain silent; (ii) the right to counsel; (iii) the right to a *hearing*; (iv) the right to question witnesses, confront his accusers, and present evidence and witnesses on his own behalf; and (v) the right to an appeal after the hearing.

128.   Shortly before the meeting ended, Plaintiff was served by an officer of the CUPD with a *persona non-grata* order that prohibited him from entering campus except to meet with members of the CUPD, later amended to allow Plaintiff to enter campus to meet with the Investigators. After petitioning to the OJA and the Cornell University Police Department, Plaintiff was also permitted to attend counseling sessions at Gannett Health Services. Kunk-Czaplicki ordered him to move out of his fraternity house that very night.

129.   However, the CUPD officer, after conferring with Attorney Shaw, countermanded Kunk-Czaplicki, determining that since Plaintiff's fraternity house was privately owned, and

hence not part of the Cornell campus, Plaintiff was not required to move out. Nonetheless, since Plaintiff's fraternity house was surrounded by the campus, he was given explicit instructions about the one path he could take to leave his house without violating the order—still leaving him a virtual prisoner in his residence.

130.    Finally, Kunk-Czaplicki informed Plaintiff that he should call someone if he had any thoughts of self-harm, thereby acknowledging the severity of her actions.

131.    The OJA's temporary suspension barred Plaintiff from taking any of his 22 credit hours of class per week (including working remotely), working at his teaching assistant job, working in his research assistant position or setting foot on campus. Not only did he miss vital course work, but he also missed crucial meetings for a scholarship program.

132.    Given that his parents reside across the country, Plaintiff had to rely on his girlfriend and her family, and his fraternity brothers, for emotional support with this matter.

**B.   The OJA Suspends Further Investigation and Defers to the Office of Workforce Policy and Labor Relations' Investigation of the Policy 6.4 Allegations.**

133.    Shortly after Plaintiff's meeting with the OJA, it became clear that Kunk-Czaplicki would not pursue its investigation under the Campus Code of Conduct; instead it would only facilitate the investigation under Policy 6.4 by the University Title IX Investigator at the Office of Workforce Policy and Labor Relations ("OWPLR"), which offers significantly fewer rights to an accused as outlined *supra*.

134.    On October 1, 2015, Plaintiff, accompanied by counsel, met with Title IX investigator Elizabeth McGrath ("October 1st Meeting") to respond to claims made by Sally Roe and to provide a verbal and written statement of his allegations against Sally Roe.

135.    Notwithstanding that James Doe made clear he was the victim in the Incident, Defendant McGrath and Assistant Judicial Administrator Arian Covington conducted an

26

interrogation of James Doe. Ms. Covington, assigned by the OJA, asked James Doe questions, took notes, and operated the voice recording.

136.   Due to the sensitive nature of the allegations both against and by James Doe, Plaintiff's counsel explicitly requested that he be interviewed by a male investigator. Since neither the Title IX office nor the OJA employed a male investigator, the supervisor of the Title IX Investigator, Alan Mittman, was requested. Defendant McGrath refused to ask Mr. Mitttman if he would participate in the investigation. Reluctantly, James Doe then submitted his statement and addressed questions without a male investigator being made available for the next two hours.

137.   During this October 1st Meeting, Defendant McGrath repeatedly asked Plaintiff questions that presupposed his guilt, seemingly in an attempt to elicit a different answer from Plaintiff than what he was providing.

138.   She was openly disdainful of his assertions and the details provided concerning the way Sally Roe held him down, remained on top of him, and caused his past trauma from a sexual assault at his former college to resurface.

139.   Although the interrogation was recorded, it was done so on a computer on which Ms. Covington was also typing. Consequently, when Plaintiff was subsequently provided with an audio file of the recording, portions were incomprehensible at times and difficult to hear due to Covington keyboarding notes on the laptop computer. A transcribed version had the same problems.

140.   Plaintiff and counsel made clear that the detailed written and oral statements provided at the October 1st Meeting constituted a formal complaint against Sally Roe under both the Code of Conduct and under Policy 6.4.

141.    However, Defendant McGrath refused to accept Plaintiff's oral complaint, and instructed that he would need to file a formal, written complaint, notwithstanding Policy 6.4's clear language that a complaint could be made either "verbally or in writing."

142.    Notably, at this point, Sally Roe had yet to submit a formal written complaint against James Doe.

143.    On October 13, 2015, Plaintiff filed a formal written complaint, which outlined how Sally Roe violated both the Code of Conduct and Policy 6.4: (i) Plaintiff was the victim of Sally Roe's sexual aggression, as she repeatedly pinned him down on his bed while straddling him after they began kissing; (ii) he attempted to remove her from this aggressive position by rolling her off of him, resulting in Sally Roe's increased aggression; and (iii) as a result of this rejection, Sally Roe punched Plaintiff in the testicles, an act which she admitted. Indeed, Plaintiff saw a doctor nearly one month after the Incident due to chronic, continuing pain in the testicles and concern about permanent injury.

144.    Plaintiff denied pulling Sally Roe's hair or choking her, as Sally Roe claimed in her version of the events, and pointed out that she provided no evidence of her supposed injuries resulting from the Incident.

145.    Sally Roe also admitted to remaining in the same fraternity house immediately after the Incident to spend the night with, and in the private room of, a fraternity brother of Plaintiff.

146.    She returned to the fraternity house again the very next evening, again staying overnight with one of Plaintiff's fraternity brothers in his room, at the same fraternity house.

147.   Certainly, had she truly been "debilitatingly afraid" of Plaintiff as she had claimed, she would not have willingly stayed and later returned to spend two overnights in his fraternity house.

148.   Significantly, after Plaintiff filed his complaint against Sally Roe, Cornell issued a no contact order to Sally Roe *but did not suspend her* or impose any other type of interim sanction for her sexual assault and physical assault on James Doe.

149.   On October 13, 2015, Plaintiff submitted to a second interrogation, led again by Title IX Investigator McGrath.  Another female staff person from the Office of Workforce Policy and Labor Relations was also present and recorded Plaintiff's interrogation, which once again lasted for over two hours. Thus, Plaintiff was interrogated for a total of over four hours.

150.   During this interrogation, the computer on which Plaintiff's testimony was being recorded lost power due to a dead battery. Consequently, a section of the recording of unknown length was lost. In addition, the recording was continued on the same computer upon which the investigator was typing—again drowning out much of what Plaintiff said.

151.   On October 14, 2015, in obvious and immediate retaliation for Plaintiff's complaint, Sally Roe filed a complaint against Plaintiff under Policy 6.4 (in addition to the already-pending Code of Conduct claim).

152.   Interestingly, in or about November 2015, Defendant McGrath was the subject of a surreptitious taping by Project Veritas. The taped interview, readily available on the Internet, showed Defendant McGrath being persuaded by a female student to shred a copy of the United States Constitution. Defendant McGrath described the Constitution as a "very flawed document" written by "flawed individuals" and complied with the student's request to shred the document.

153.    Defendant McGrath's lack of respect for the highest law of the land certainly disqualifies her from serving in any investigatory process funded in part by the federal government and subject to federal Title IX regulations and New York State Education Law.

154.    Upon information and belief, these facts were known, and this video was seen, by Cornell University supervisors. Yet, no disciplinary action or termination of Defendant McGrath was implemented by Cornell University.

### C.  Plaintiff's Temporary Suspension Is Reversed on Appeal.

155.    On October 7, 2015, Plaintiff filed a petition to reverse his temporary suspension on the grounds that (i) under Cornell's Code of Conduct mid-semester suspensions should only be imposed in extraordinary circumstances (e.g. when a potential felony criminal charge is at stake); (ii) the OJA failed to conduct an adequate and impartial investigation; and (iii) the OJA's failure to consider the consequences of Plaintiff's mid-semester suspension was arbitrary and capricious.

156.    Incredibly, Kunk-Czaplicki made redactions to Plaintiff's petition without consulting either Plaintiff or his attorney. This redacted version of Plaintiff's petition, which excluded information concerning the sexual activity Sally Roe engaged in within Plaintiff's fraternity house for two consecutive nights following the Incident, was submitted to the Reviewing Panel. (While the applicable "rape shield" rules apply at Cornell, its exception for assessing credibility of the complainant also apply.)

157.    Demonstrating a clear lack of impartiality in the investigative process, on October 13, 2015, Ms. Covington and Kunk-Czaplicki submitted a response to Plaintiff's petition.

158.    Rather than acting as impartial investigators charged with the sole task of gathering relevant facts, Ms. Covington and Kunk-Czaplicki acted as advocates for the complainant when they vehemently opposed Plaintiff's request to lift the suspension.

159.    On October 15, 2015, the Reviewing Panel agreed with Plaintiff and unanimously removed the temporary suspension issued by the OJA.

160.    On October 26, 2015, Plaintiff was reinstated and the OJA issued a mutual no contact order. To date, Plaintiff has fully complied with that order.

161.    Sally Roe appealed the decision to the University Review Board, which upheld the Panel's removal of the suspension by decision dated November 13, 2015.

162.    By the end of the fall semester, approximately ninety days since the date of the Incident, Cornell's Title IX investigation continued, despite the fact that Policy 6.4 requires the completion of such investigations within 60 days. Meanwhile, the OJA investigation was never commenced, despite repeated requests and demands by Plaintiff's counsel to do so.

**D.  Cornell Hands Down a One-Year Suspension.**

163.    After he was reinstated, Plaintiff received no warning that he might again be subject to mid-semester disciplinary action by either the OJA or under Policy 6.4.

164.    As Defendant McGrath continued to investigate the Policy 6.4 complaints and the OJA refused to take any further action concerning the accusations made under the Code of Conduct—Plaintiff enrolled at Cornell for the spring semester in good faith and with the approval of Cornell.

165.    Consequently, he paid the required tuition and fees, room and board costs, travel back to Cornell from his home in Alaska, and resumed a very demanding curriculum amounting to 23 credit hours.

166.   Meanwhile, in response to Cornell's excessively delayed investigation process, Plaintiff's counsel renewed his demands to the OJA by phone and email, insisting that Cornell commence their investigation and conduct a hearing on the Complaints and Cross-Complaints under the Code of Conduct.

167.   On February 15, 2016—over 135 days after the Incident—Defendant McGrath finally issued a Confidential Investigative Report (the "Investigative Report"), in which she recommended a suspension for a minimal duration of one year.

168.   Given the lack of any formal hearing, Defendant McGrath's recommendation was based primarily on her subjective assessment of the credibility of Sally Roe and Plaintiff, without any benefit of cross-examination or explanation of extensive inconsistencies.

169.   The Investigators engaged in several procedural errors that violated Plaintiff's right to a fair and impartial process in preparing the Investigative Report.

170.   First, the Investigators arbitrarily and unilaterally redacted certain portions of Plaintiff's responses to the appendices despite their inability to cite any authority in support of this action. In particular, while recognizing that a delay in reporting does not necessarily negate a claim of sexual assault, Plaintiff sought to include in the Investigative Report the fact that Sally Roe did not report the alleged misconduct to her parents for at least a week despite her alleged fear and her alleged concern for her safety. Defendant McGrath declined to include this piece of information on the grounds that it was not "part of the record" yet subsequently noted in the Investigative Report that James Doe had a motive and opportunity to lie as demonstrated by the fact that he did not complain to Cornell about being assaulted by Sally Roe until he had been temporarily suspended (which was in fact, incorrect). Curiously, the Investigators footnote that little weight was given to Plaintiff's delay in reporting since "sexual assault is a notoriously

32

underreported crime and many people delay in reporting, if they report at all". Yet, if this were the case, there was no basis for redacting the statement concerning Sally Roe's delay in reporting the alleged misconduct to her parents.

171.    Second, the Investigators failed to redact from the Investigative Report statements concerning Plaintiff's alleged interest and experimentation in BDSM despite the highly prejudicial nature, and lack of any probative value, of such information. Despite Cornell's policy that prior sexual conduct be excluded from an investigation, the Investigators included within the Investigative Report a double hearsay statement from Witness C.R. concerning Plaintiff's alleged experience with BDSM in reference to whether Sally Roe's claims of being choked by Plaintiff were credible, and a statement from Plaintiff's girlfriend indicating that she had spoken with him about BDSM in the course of their relationship. Certainly, the inclusion of this information was meant to corroborate Sally Roe's account. The Investigators included these statements for the sole purpose of assuring the Review Panel would uphold their finding of guilt against Plaintiff. Contrarily, the Investigators failed to ask Witness A.S. the questions posed by Plaintiff concerning Sally Roe's proclivity to straddle someone or pin someone down.

172.    Further, the Investigators intentionally excluded any information that could cast doubt on Sally Roe's credibility. For example, during her first interview with the Investigators, Sally Roe stated Witness S.E. talked her into speaking with the JA. Yet, the Investigators failed to explore this comment further or take it into consideration when assessing each party's motivation for filing a complaint.

173.    Additionally, in Sally Roe's interview of September 29, 2015, when questioned about her reason for striking Plaintiff in the testicles during their encounter, she was unable to

provide an explanation. Defendant McGrath proposed to Sally Roe, the accused student: "so you hit him in self-defense," effectively providing Sally Roe with an explanation for her actions.

174.    Ultimately, Sally Roe adopted this position for the remainder of the investigatory process. However, this exchange was not noted anywhere in the Investigation Report. It was entirely improper and a clear violation of Cornell's Policies for the supposedly impartial Investigators to provide one party with the explicit name of a defense to the charges against her. Notably, at no time did the Investigators assist Plaintiff in formulating his defense to the charges, demonstrating a clear gender bias against him.

175.    Moreover, when asked in her first interview whether she needed any further accommodations in the context of avoiding Plaintiff, she asserted that she did not. Yet, after retaining a new advocate, Sally Roe suddenly alleged that she feared for her safety and required additional protections from Plaintiff. This discrepancy suggests Sally Roe's alleged fear was contrived; however, there was no mention made of this inconsistency in the Investigative Report.

176.    This statement claimed she feared to even walk down the street on which the fraternity house was located, ignoring the fact she spent the night there, after the Incident, and returned the next night to stay over again with a different fraternity brother.

**E.  The Faculty Review Panel.**

177.    On or about March 15, 2016, the Faculty Review Panel (the "Panel") assigned to Plaintiff's Policy 6.4 case received the Investigative Report for determination of a final decision and sanction.

178.    After meeting on March 24 and April 12, 2016, the Panel issued its Report of the Reviewers on April 14, 2016. The Panel accepted as fact the conclusions drawn in the

Investigative Report and issued a decision which followed the Investigators' recommended findings against Plaintiff.

179. Prior to issuing its decision, the Panel questioned the Investigators as to the conditions that would be imposed with respect to Plaintiff's re-admission to Cornell after serving a suspension. Defendant McGrath informed the Panel that such conditions could include requiring the respondent to participate in counseling, directed study and/or anger management, all of which were eventually incorporated into the Panel's decision and sanction.

180. The Panel specified that Plaintiff's petition for re-admission would be evaluated by the Judicial Administrator and the Title IX Coordinator. However, there is a clear conflict of interest when the same people who conducted the investigation and made recommendations against Plaintiff would also be responsible for determining whether to grant his request for re-admission to the University.

181. Neither the recommendations of Defendant McGrath, nor the Panel's decision advised that the suspension would be effectuated immediately.

182. Regardless, on April 14, 2016, Plaintiff was once again immediately suspended by the same Interim Judicial Administrator, Defendant Kunk-Czaplicki. He was contacted in the middle of his course work and issued a *persona non-grata* order and escorted off campus. This occurred despite Plaintiff's right to file an immediate appeal of the Panel's decision, which he timely filed, and despite the upcoming conclusion of the spring semester.

183. On April 26, 2016, Cornell reversed its decision to suspend Plaintiff on the grounds that the spring semester was nearly concluded and Plaintiff had remained compliant with the no contact order. Plaintiff's suspension was stayed until the Policy 6.4 process was completed, allowing him to complete the semester. Plaintiff thereafter timely filed an appeal.

184.     Subsequently, on May 11, 2016, Plaintiff commenced a special proceeding against Cornell pursuant to New York's Article 78 and Section 3001 of the Civil Practice Law and Rules ("CPLR"), arising out of Cornell's violations of the New York State Education Law Section 6444(5) ("Section 6444(5)"). Plaintiff sought and secured a stay of any further action by Cornell.

### F.  **Plaintiff Suffers Significant Emotional Damages as a Result of Cornell's Actions.**

185.     Since being subjected to the first temporary suspension in September 2015, Plaintiff has suffered grave emotional distress and mental anguish. He was diagnosed with severe anxiety and Major Depressive Disorder, neither of which he had a history of.

186.     During his first suspension, and upon his return to campus for the spring 2016 semester, Plaintiff began weekly counseling sessions on campus, attended consults with a psychiatrist and received prescribed medications. Currently, Plaintiff continues to attend such therapy sessions and takes seven prescribed medications.

187.     The Panel's decision to suspend Plaintiff late in the spring semester only served to exacerbate Plaintiff's emotional distress.

188.     Cornell and the Interim JA were aware of Plaintiff's ongoing care for such distress and yet subjected him to another suspension prior to the end of the semester.

189.     On April 14, 2016 at 1:10 p.m., Plaintiff received an email from Defendant Kunk-Czaplicki requesting that Plaintiff meet with her before 5:00 p.m. that day. Plaintiff presumed, correctly, that this meeting was being scheduled to notify Plaintiff that he would be suspended. Thereafter, on the afternoon of April 14, 2016, Plaintiff attempted to commit suicide by cutting his femoral artery. Though he sustained injuries as a result of the cutting, he fortunately missed the artery and suffered non-life threatening injuries.

190. Consequently, Plaintiff was hospitalized at Cayuga Medical Center from April 15 through April 19, 2016. Plaintiff's parents flew from their home in Bethel, Alaska, at short notice and at considerable expense, to offer him emotional support and supervise his medical care.

191. As a result of Defendants' actions, Plaintiff has suffered and continues to suffer severe and significant emotional damages, including major depression, panic attacks, anxiety, obsessive thoughts, social anxiety, agoraphobia, paranoia, insomnia and suicidal ideations. Plaintiff was prescribed an anti-depressant and anti-anxiety medication, which he continues to take.

### G. Plaintiff Was Deprived of a Hearing When the Case Was Investigated Under Policy 6.4 Instead of the Code of Conduct.

192. Because Plaintiff's case was investigated under Policy 6.4, as opposed to the Code of Conduct, he was denied a hearing before an impartial panel, could neither confront his accuser, nor challenge the witnesses against him, and could not present any testimony or evidence in support of his defense to an impartial panel.

193. Cornell's OJA intentionally stalled its prosecution of Sally Roe's Code of Conduct complaint against Plaintiff and failed to investigate Plaintiff's allegations against Sally Roe (i.e. her admitted hitting him in the testicle) under the same Code, which would have afforded Plaintiff a fact-finding hearing, the right to cross-examine complaining witnesses and a review panel that included three of his peers, instead pursuing solely the Policy 6.4 complaint against Plaintiff which afforded minimal procedural protections.

194. Per the documentation provided to Plaintiff by the OJA on September 25, 2015, he was entitled to a prompt investigation and hearing under Cornell's Code of Conduct, which was never provided after Kunk-Czaplicki stalled the OJA process.

195.    Cornell's suspension of Plaintiff late in the semester was arbitrary and capricious because: (i) the Title IX Investigator's extensive delay in concluding its investigation dragged the process into the spring semester; (ii) Cornell permitted Plaintiff to enroll for the spring semester despite the pending investigation; (iii) Plaintiff was given no warning that he could suffer another suspension prior to the end of the semester (which would jeopardize the completion of his junior year); and (iv) there was no ground for his immediate suspension since Plaintiff complied with the mutual no contact order and was not subject to any further disciplinary issues.

196.    On April 26, 2016, Cornell reversed its decision to suspend Plaintiff on the grounds that the spring semester was nearly concluded and Plaintiff had remained compliant with the no contact order. Plaintiff's suspension was stayed until the Policy 6.4 process was completed.

197.    Plaintiff thereafter timely filed an appeal.

**VII.    Procedural History- Plaintiff's Article 78 Proceeding**

198.    On May 11, 2016, Plaintiff commenced a special proceeding against Cornell pursuant to New York's Section 7805 ("Article 78") and Section 3001 of the Civil Practice Law and Rules ("CPLR"), arising out of Cornell's violations of the New York State Education Law Section 6444(5) ("Section 6444(5)").

199.    It is well established in New York that Article 78 proceedings are the appropriate vehicle to challenge the conduct of private universities in administering their disciplinary policies.

200.    On May 12, 2016, the Honorable Eugene D. Faughnan of the Supreme Court of the State of New York, County of Tompkins issued an order to show cause instructing, *inter alia*,

that "pending the hearing and determination of this Article 78 proceeding, that respondent Cornell University be temporarily restrained from adjudicating any claims against [James Doe], or the appeal by submitted by [James Doe] concerning the disciplinary process and Panel Decision."

201.    Judge Faughnan further ordered that "respondent Cornell University conduct a thorough and unbiased hearing before an impartial panel concerning [James Doe's] complaint against [Sally Roe], which has to date been wholly disregarded."

202.    The parties appeared for oral argument before Judge Faughnan on Plaintiff's Article 78 proceeding on July 22, 2016.

203.    Thereafter, on September 9, 2016, Judge Faughnan denied Plaintiff's Article 78 Petition with leave to renew upon a final determination of his appeal, which was stayed by the Court's May 12, 2016 order. Judge Faughnan concluded that the action was premature as there had been no final determination with regard to the appeal filed pursuant to Policy 6.4

204.    On September 30, 2016, Plaintiff filed an order to show cause and motion for contempt to compel Cornell's compliance with the court's order of May 12, 2016, on the grounds that Cornell had failed to convene a Code of Conduct hearing concerning James Doe's complaint against Sally Roe, in contravention of the Court's order.

205.    On September 30, 2016, Plaintiff also filed a motion to re-argue the Article 78 petition pursuant to CPLR §2221(d).

206.    On October 5, 2016, Judge Faughnan issued an order: (i) denying the Petition as premature, with leave to renew upon a final determination made by Cornell pursuant to Policy 6.4, and (ii) vacating the Court's May 12, 2016 order, lifting the Temporary Restraining Order

and removing the restraints placed on Cornell regarding adjudication of Plaintiff's claims or the appeal submitted by Plaintiff concerning the disciplinary process and Panel Decision.

207.     Subsequently, after a telephone conference with all parties, Judge Faughnan executed an order on or about November 15, 2016 requiring the parties to "move ahead promptly with all outstanding Campus Proceedings" involving Plaintiff. Specifically, the parties were required to actively pursue completion of Cornell's Policy 6.4 matter and the complaint under the Campus Code of Conduct.

### VIII.   Michelle Horvath Resumes Investigating the Code of Conduct Complaints

208.     On October 20, 2016, the new JA Michelle Horvath ("Ms. Horvath") who began her position in June 2016, contacted Plaintiff to find out whether he was still interested in filing a formal complaint under the Code of Conduct. Ms. Horvath explained: "Since I am new, I do not want to rely on the notes of someone else.  If you do not want to come in, you could also complete the incident report on-line."

209.     After clarifying that he did intend to pursue the formal complaint he had originally filed more than one year earlier, Plaintiff scheduled a meeting with Ms. Horvath for October 26, 2016.

210.     On October 26, 2016, Plaintiff met with Ms. Horvath who commenced the meeting by indicating she wanted to get first hand input from Plaintiff on his claims and the events. However, she then presented him with his statement submitted more than one year earlier, asked him to re-read it and then she asked if he wanted "to add anything."

211.     While Plaintiff added that he was fearful of Sally Roe, he otherwise confirmed that everything in his original statement was accurate.

212.   Despite stating that she wanted to start fresh and consider a firsthand statement from Plaintiff, Ms. Horvath failed to ask any further questions, never probed for any details about Plaintiff's statement, and failed to question him about the nature or degree of his injuries.

213.   Curiously, Ms. Horvath incorrectly asserted that the claim and charges filed against Plaintiff for violations of the Code of Conduct were filed by the Interim JA (i.e. the University) and not by Sally Roe. She further alleged that if the charges were filed by the University OJA, as complainant to this case, she had the authority, and was inclined, to withdraw such charges on the theory that they overlapped with the charges filed under the previous Policy 6.4 and could be handled by that process instead. Notably, if the JA were permitted to withdraw the charges, Cornell would be able to deprive Plaintiff of a hearing under the Code of Conduct.

214.   However, any claim that the JA was the complainant in this matter, rather than Sally Roe, defies logic as well as the case file; this was the first time that anyone involved had asserted the complainant was the University itself. Indeed, Kunk-Czaplicki and Ms. Covington expressly referred to Sally Roe as the complainant in all documents and records related to this matter.

**IX.    Defendants Circumvent Cornell's Procedures to Deprive Plaintiff of a Hearing on the Complaints Brought Under the Code of Conduct**

215.   In furtherance of Cornell's campaign to deprive Plaintiff of a hearing at all costs, on both the charges against him and on the charges he filed against Sally Roe, on November 8, 2016, Ms. Horvath issued decision letters on the complaints filed under the Code of Conduct.

216.   With respect to Plaintiff's Campus Code of Conduct complaint filed against Sally Roe, Ms. Horvath found Sally Roe not responsible for sexual assault or endangerment to persons. Failing to provide any rationale for her findings, Ms. Horvath vaguely stated "This conclusion was based on a subsequent investigation into the report, and an analysis and

application of the gathered information leading to the the (sic) standard of proof of the clear and convincing standard unable to be met." Significantly, Ms. Horvath failed to provide a proper rationale for her conclusion, depriving Plaintiff of any meaningful opportunity to appeal.

217.    With respect to Sally Roe's Code of Conduct complaint filed against James Doe, Ms. Horvath found James Doe not responsible for a violation of the Code, simply stating "the finding of not responsible was based on the fact that jurisdiction for the case has been lost." Ms. Horvath subsequently explained to Plaintiff's counsel that her determination was based on the conclusion that to the extent James Doe did assault Sally Roe, then it was "sexual" or "gender based" assault, allegations that were delegated to the Policy 6.4 process. In fact, Ms. Horvath was wrong; the language in the Code prohibiting assault specifically includes assault *on the basis of gender*, and thus these claims are independent of Policy 6.4.

218.    Furthermore, during Plaintiff's interview with Defendant McGrath and Ms. Covington on October 1, 2015, Ms. Covington confirmed that the OJA would conduct an investigation and hold a hearing on the non-sexual assault allegations filed by both James Doe and Sally Roe. Kunk-Czaplicki and Ms. Covington were asked repeatedly by Plaintiff's counsel to conclude their investigations and hold hearings as required by the Code. At no time did anyone assert a lack of jurisdiction; thus, Ms. Horvath acted arbitrarily and capriciously when she decided one year later than no action would be pursued, and no hearing would be held on the charges against James Doe due to an alleged "lack of jurisdiction."

219.    It was unclear whether this decision that no action would be pursued due to an alleged "lack of jurisdiction" was subject to an appeal.

220.    Though a correct finding of non-responsibility had been reached, once again Cornell's actions were informed by its intent to deprive James Doe of a hearing at all costs.

Plaintiff was consequently denied his procedural rights to have both cases heard by an impartial and objective panel, to cross-examine witnesses against him, and to challenge Sally Roe's accounts.

221.    On November 15, 2016, Judge Faughnan ordered that the parties "move ahead promptly with all outstanding Campus Proceedings involving [Plaintiff]. Specifically, the parties will actively pursue the completion of the Cornell University Policy 6.4 matter (which is at its final appeal stage), and the complaint under the Campus Code of Conduct arising from the incident which occurred on September 18, 2015."

222.    On November 18, 2016, Plaintiff timely submitted appeals on both decisions issued by Ms. Horvath.

223.    On November 23, 2016, Vice President Ryan T. Lombardi ("Mr. Lombardi") issued a decision on both parties' appeals concerning the Policy 6.4 complaints. Mr. Lombardi, on behalf of the Panel, affirmed the finding of the Panel that James Doe violated Policy 6.4 while Sally Roe did not violate the policy as she acted in self-defense.

224.    The Panel modified the sanction of indefinite suspension, instead placing James Doe on probation, the violation of which could result in elevated sanctions. Further, prior to the awarding of his degree, Plaintiff was to complete a directed study in consent and communication; complete an assessment by Counseling & Psychological services as outlined in the investigation report; and the no contact order was to remain permanently in place.

225.    On November 30, 2016, acting as an advocate for the complainant, Ms. Horvath further demonstrated a lack of impartiality when she submitted a response to James Doe's appeal, requesting that the decision of "No Action" be upheld.

43

226.    On December 2, 2016, Plaintiff submitted his reply to the OJA's response to his appeal of the decision determining that no action should be taken on Plaintiff's Code of Conduct complaint against Sally Roe.

227.    On December 6, 2016, the University Hearing Board issued its final decision on the Code of Conduct complaints. The University Hearing Board was comprised of three students, one faculty member, one staff member and led by a hearing chair. The University unanimously upheld the OJA's "No Action" on the complaint filed by Plaintiff against Sally Roe, vaguely agreeing with the OJA's assessment that Sally Roe acted in self-defense, and finalizing Cornell's decision to deprive James Doe of any hearing whatsoever.

## X.    Gender Bias Against Plaintiff as both the Male Complainant and Male Accused

228.    Pursuant to the U.S. Department of Education Office for Civil Rights' Guidelines, Cornell was required to conduct an impartial and unbiased investigation process.

229.    Upon information and belief, Defendants have recognized the increased pressure, both internally and from the United States government to aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

230.    In fact, Cornell's response to this pressure, and attempts to avoid rescission of federal funding, is evident from a review of its recent Annual Fire Safety & Security Reports (the "Clery Reports"). Cornell's Clery Reports dating back to 2011 reveal that the number of forcible sex offenses/rapes reported on Cornell's campus has steadily increased from 2 in 2011 to 12 in 2015.

231.    Upon information and belief, the U.S. Department of Education's Office for Civil Rights has opened a sixth inquiry into alleged mishandling of sexual assault investigations by

Cornell University, making it the college with the most active Title IX investigations in the nation.

232.   In conforming to archaic assumptions about the roles of males and females in a sexual encounter, Defendants demonstrated a presumption of guilt against Plaintiff as the male student accused of sexual and non-sexual misconduct and disregarded his valid claims of misconduct against Sally Roe.

233.   In actively pursuing Sally Roe's complaints of misconduct, while overlooking and failing to investigate Plaintiff's complaints against Sally Roe, Defendants conducted an investigation and adjudication motivated by gender bias and discrimination against the male accused of misconduct.

234.   Defendants conducted a fatally flawed investigation replete with significant procedural and due process violations that led to an erroneous finding of responsibility on the part of James Doe and a failure to pursue Plaintiff's claims against Sally Roe.

235.   Defendants deprived Plaintiff of the minimal requirements for procedural fairness by utilizing Cornell's inherently biased Policy 6.4 and skirting the requirements of the Code of Conduct, choosing instead to employ a Kafkaesque process in which there was no cross-examination, no sworn testimony, no hearing of any kind, no presumption of innocence but rather a presumption that the female's allegations were true, no reasoned consideration of evidence as required by the burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in discriminatory decision-making and a prejudiced ability for the respondent to prepare and submit an appeal.

236.    Instead, the OJA failed to complete its investigation, or bring charges, while pursuing only the complaint against Plaintiff filed under its violative Policy 6.4, which deprives students accused of misconduct of their most fundamental rights.

237.    Defendants further demonstrated how their investigation was motivated by gender bias against James Doe as the male accused when Kunk-Cziplicki imposed an interim suspension on Plaintiff based primarily on the statements obtained from three of Sally Roe's friends who only learned of the Incident from speaking with Sally Roe herself after the fact, and prior to speaking with Plaintiff about his version of events.

238.    Moreover, the Investigators demonstrated a bias against Plaintiff as the male complainant, as well as the male accused, when they explicitly overlooked the inconsistencies in Sally Roe's account, in an effort to find her more credible. Specifically, the Investigators noted in their Investigative Report the following inconsistencies: in her initial interview, Sally Roe stated she met Plaintiff in Collegetown, not at the fraternity house as she and other witnesses later stated; she claimed it was her first time in the fraternity house, though later she changed her account to admit she had been there on prior occasions; and she did not identify A.S. as the person with whom she had a dating relationship prior to the night of the Incident. Yet, the Investigators chose to wholly disregard these inconsistencies on the grounds that they were "more likely a result of her wish to keep details of her life private…"

239.    Furthermore, the Investigators overlooked additional inconsistencies between Sally Roe's statements and the statements made by witnesses. For instance, while Witness A.S. stated Sally Roe did not leave the fraternity house until approximately 7:00 or 8:00 a.m. on September 18, 2015, Sally Roe asserted she left around 3:00 a.m. Additionally, while Sally Roe assured the Investigators in response to their direct question that she did not spend the night of

September 18-19, 2015 at James Doe's fraternity house, Witness C.R. recalled that she had come back to the house and spent the night there with another brother. Again, in an attempt to discredit any evidence harmful to the female complainant, the Investigators improperly overlooked these inconsistencies on the grounds that the witnesses had "formed opinions of [Sally Roe's] behavior before speaking to the investigator."

240.    In a "he said/she said" situation where the accounts of each party are disputed and there are no independent eyewitnesses to corroborate one party's version of events, an analysis of credibility is critical. While acknowledging that whether a witness' statement is internally consistent over time is an important factor in assessing credibility, the Investigators improperly deemed the inconsistencies in Sally Roe's statements to be unrelated to the Incident and thus irrelevant to a credibility assessment. Conversely, the Investigators determined that Plaintiff provided inconsistent accounts of the events because "his actions seemed inconsistent with the emotions he described." However, rather than question James Doe as to these supposed inconsistencies, they instead drew conclusions based on their own subjective beliefs.

241.    Further, the Investigators put substantial weight on the "plain language" of the text messages exchanged between Plaintiff and Sally Roe in the hours after the Incident, concluding that these messages "provide the clearest record of their feelings toward one another." However, the Investigators took the text messages out of context in deeming the statements made by Plaintiff to be admissions of guilt rather than an attempt to resolve the awkward and uncomfortable encounter. Notably, at no time did the Investigators question Plaintiff about these text messages or ask for his verbal explanation of the meaning behind his statements. Had they done so, they would have discovered that, given his non-confrontational nature, Plaintiff reached out to Sally Roe simply in an effort to open a dialogue.

242.   The Investigators projected their own beliefs about what an appropriate response would have been to Sally Roe's allegations in concluding that Plaintiff was not credible because he apologized to Sally Roe.

243.   Had Plaintiff been afforded an adequate opportunity to respond to the conclusions made in the Investigative Report, he would have clarified that Sally Roe's physical assault on him and her false allegations were so shocking and distressing that he did not know how to respond, other than attempting to defuse the situation by apologizing for any misunderstanding concerning what transpired between them.

244.   Even more telling of the bias demonstrated against Plaintiff, prior to speaking with Plaintiff or any of his witnesses, the Investigators suspended him based exclusively on Sally Roe's allegations, before making any attempt to determine the credibility of Sally Roe or compare it to the Plaintiff's.

245.   Conversely, after Plaintiff filed his complaint against Sally Roe, Cornell issued a no contact order to Sally Roe *but did not suspend her* or impose any other type of interim sanction.

246.   Further, the Investigators irrationally concluded that Plaintiff had a motive and opportunity to lie, notwithstanding that both parties were named respondents to misconduct complaints. The Investigators focused on the fact that Sally Roe's Code of Conduct complaint was filed first, concluding inexplicably that this meant she therefore had no time to fabricate a complaint. However, the Investigators omitted from this consideration that one day after Plaintiff filed a formal written complaint against Sally Roe, outlining how she violated both the Code of Conduct and Policy 6.4, Sally Roe filed a complaint against Plaintiff under Policy 6.4. Evidently, Sally Roe had a clear motive in filing the Policy 6.4 complaint against Plaintiff; namely,

retaliation for his filing a sexual misconduct complaint against her. Yet this potential motive was never taken into consideration.

247.   Moreover, the Investigators failed to consider that the reason Plaintiff did not report the initial complaint as quickly as Sally Roe did was due to his preference to avoid confrontation, embarrassment over what had occurred, or discomfort in disclosing such personal information to an all-female investigative team, rather than the untruthfulness of his allegations.

248.   Finally, while Sally Roe was interviewed on four separate occasions, during which she was permitted to offer additional details and clarifications not previously provided, Plaintiff was interviewed on only two occasions, both of which were conducted as interrogations rather than as fact gathering processes.

249.   The foregoing demonstrates a process that was neither fair nor impartial. Defendants conducted an investigation motivated by gender bias and calculated to lead to a predetermined result based on pre-existing beliefs about victims of sexual misconduct and the roles of males and females in such interactions.

### AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972-
### Erroneous Outcome (Against Cornell University)

250.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

251.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

252.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Cornell.

253.   Upon information and belief, approximately 46% percent of full-time undergraduates at Cornell receive some kind of need-based financial aid and the average need-based scholarship or grant award at Cornell is $38,377.

254.   Upon information and belief, in 2016 Cornell received more than $7 million in federal funding for research and development.

255.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

256.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

257.   In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

258.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[4]

259.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[5]

260.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[6]

261.    The Second Circuit recognizes a private cause of action under Title IX where a plaintiff alleges that an educational institution implemented disciplinary actions that discriminated against the plaintiff based on sex. *See Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir.1994).

---

[4] *Id.* at 22 (emphasis added).
[5] *Id.* at 20.
[6] *Id.* at 21.

262.    Title IX claims arising from university disciplinary hearings are generally analyzed under an erroneous outcome or selective enforcement theory. *See Xiaolu Peter Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015).

263.    Under the erroneous outcome theory, the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings. Under selective enforcement cases, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

264.    An "erroneous outcome" occurred in this case because James Doe was innocent and wrongly found to have committed a violation of Cornell's policies and gender bias was a motivating factor.

265.    The denial of due process in this case resulted in an "erroneous outcome" based on an erroneous and distorted conception of the facts.

266.    Based on the foregoing, *supra,* at ¶¶ 228-249 Defendant Cornell deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Cornell's guidelines and regulations.

267.    Based on the foregoing, *supra,* at ¶¶ 228-249, Defendant Cornell failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of the Incident and subsequent adjudication in a manner that was biased against Plaintiff as both a male complainant and a male respondent.

268.    Cornell's discriminatory process deprived James Doe, as a male student, of educational opportunities at Cornell on the basis of his sex.

269.    Cornell erroneously found James Doe responsible for sexual misconduct despite the absence of any reliable or credible evidence.

270.    Cornell applied its stated Policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome.

271.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon James Doe. These circumstances include, *inter alia*:

    a.  the Investigators assisted Sally Roe in explaining her actions as self-defense, while failing to assist Plaintiff in formulating his defense to the charges;

    b.  the Investigators demonstrated a presumption of guilt against Plaintiff when they interrogated him in an aggressive and hostile manner, notwithstanding that he was also a complainant alleging misconduct on the part of Sally Roe;

    c.  Defendants pursued the complaint against Plaintiff under the more violative Policy 6.4 and intentionally deprived him of his fundamental rights including the right to a hearing;

    d.  Defendants accepted Sally Roe's allegations at face value when they imposed an interim suspension upon Plaintiff prior to hearing his version of the events;

    e.  Defendants disregarded and explained away inconsistencies in Sally Roe's statements to avoid finding her less credible;

    f.  Defendants included highly prejudicial information concerning Plaintiff's prior sexual conduct and interests in the Investigative Report in an effort to provide further support for Sally Roe's claims; and

g. Defendants issued dissimilar no contact orders.

272.   Upon information and belief, Cornell was encouraged by federal officials to institute solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

273.   Upon information and belief, Cornell possesses communications evidencing Defendants' predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

274.   The institutionalized gender bias against males accused of sexual misconduct results in part from archaic assumptions and opinions about male and female roles in sexual encounters.

275.   Upon information and belief, Cornell has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

276.   Upon information and belief, all students that have been disciplined by Cornell for sexual misconduct have been male.

277.   Upon information and belief, Cornell's mishandling of the Complaints and Cross-Complaints was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

278.   As outlined above, the outcome was predetermined and simply a motion into a biased, prejudiced and implicitly unfair process, calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged.

279.   Based on the foregoing, Defendant Cornell imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed investigation.

280.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

281.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

282.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983-Violation of the Fourteenth Amendment of the United States Constitution Procedural Due Process (Against Cornell University)

283.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

284.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

285.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

286.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

287.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX".

288.   Revising previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

289.   For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(i)     Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(ii)    Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)   Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)    Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)     Required to prohibit cross-examination by the accused student;

(vi)    Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

290.   Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter. For example, in July 2014, former DOE Assistant Secretary for Civil Rights Catherine Lhamon ("Secretary Lhamon") stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Secretary Lhamon warned.

291.    Upon information and belief, since 2011 Cornell has revised its policies in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties.

292.    The Dear Colleague Letter has resulted in significant action and legal consequences; Secretary Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

293.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Secretary Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools;" Secretary Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

294.    Accordingly, Cornell was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

295.    Cornell applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated Sally Roe's sexual assault complaint against James Doe.

296.    Upon information and belief, Cornell is a hybrid public/private university as three of Cornell's seven undergraduate colleges are public, state-supported statutory or contract colleges through the State University of New York (SUNY) system.

297.   Under clear and controlling federal constitutional case law, a private actor becomes a state actor when its actions are coerced by the United States government. *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012).

298.   Under clear and controlling federal constitutional case law, a private actor required by the United States to investigate and adjudicate alleged violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

299.   Accordingly, when Cornell investigated and adjudicated the Complaints and Cross-Complaints, Cornell was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

300.   In the course of such investigation and adjudication, Cornell flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

301.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication, his right to be heard by an impartial factfinder, to cross-examine his accuser, and to challenge evidence and witnesses in support of his defense before an impartial arbiter. Rather than investigate what actually occurred on September 17-18, 2015, Defendants conducted a superficial investigation biased against Plaintiff as a male accused of misconduct.

302.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct, in violation of the Fourteenth Amendment.

303. Based on the foregoing, Cornell was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Sally Roe's complaint against James Doe.

304. Based on the foregoing, Cornell also acted under color of law in violating Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

305. As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

306. Accordingly, Defendants are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

307. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

308. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Violation of the New York State Education Law § 6444(5)(Against Cornell University)

309. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

310. On July 7, 2015, New York Governor Andrew Cuomo signed into law Article 129-B of the New York State Education Law, a comprehensive legislation aimed to prevent sexual assault on college campuses. Enacted as part of his "Enough is Enough" campaign,

Article 129-B sought to change the way higher education institutions handled reports of sexual misconduct by setting forth uniform policies and reporting requirements.

311.    While some provisions of Article 129-B reinforced existing obligations imposed on higher education institutions by, for example, Title IX, it also imposed several new requirements including a uniform statewide definition of "consent."

312.    Each institution, including Cornell, was obligated to implement the requirements set forth in the article by amending its code of conduct or other policies by October 5, 2015.

313.    The specific requirements of Article 129-B are codified at New York Education Law Sections 6439-6450.

314.    New York State Education Law Section 6444(5)(b) provides, in part, the following rights to the reporting party and responding party in a school disciplinary proceeding:

> The right to a process in all student judicial or conduct cases, where a student is accused of sexual assault, domestic violence, dating violence, stalking, or sexual activity that may otherwise violate the institution's code of conduct, that includes, *at a minimum*...(ii) an opportunity to offer evidence during an investigation, and *to present evidence and testimony at a hearing*, where appropriate, and have access to a full and fair record of any such hearing. N.Y. Educ. Law § 6444 (McKinney) (emphasis added).

315.    As discussed *supra*, Cornell failed to provide Plaintiff with a hearing on either the Complaints or Cross-Complaints, despite his repeated requests.

316.    Cornell failed to provide Plaintiff with the required statutory hearing process prior to suspending him for a minimum of one year.

317.    Consequently, Cornell directly violated Section 6444(5) of the New York Education Law by failing to hold a hearing on the charges brought by Plaintiff, or on the charges brought against Plaintiff, in violation of his fundamental and statutory rights.

318.     As discussed at ¶¶ 198-207 *supra,* Plaintiff properly commenced a proceeding pursuant to Article 78 to challenge Cornell's disciplinary process on the grounds that it violated state law, including Article 129-B, and was arbitrary and capricious.

319.     Article 129(B) expressly contemplates a student's implied right of action challenging an administrative agency's decision, pursuant to Article 78.

320.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

321.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of Contract (Against Cornell University)

322.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

323.     At all times relevant hereto, a contractual relationship existed between Cornell and James Doe through Cornell's Policies and procedures governing the student disciplinary system, including but not limited to the Code of Conduct and Policy 6.4.

324.     Through the documents it publishes and provides to students, Cornell makes express contractual commitments to students involved in a disciplinary process.

325.     Based on the foregoing, Cornell created express and implied contracts with Plaintiff.

326.     Based on the aforementioned facts and circumstances, Defendant Cornell breached express and/or implied agreement(s) with Plaintiff.

327.    Defendant Cornell committed several breaches of its agreements with Plaintiff during the investigation and hearing process, including *inter alia*:

## A. Failure to Provide Plaintiff with a Hearing on either the Complaints or Cross-Complaints.

328.    Cornell's Code of Conduct provides: "[a] five-person panel of the University Hearing Board shall adjudicate cases under the Campus Code of Conduct." Further, Cornell's revised Policy 6.4 provides: "[f]indings of responsibility and determinations regarding sanctions and remedies are made through a hearing process conducted by a three (3) member Hearing Panel and a non-voting Hearing Chair."

329.    Notwithstanding, Defendants failed, and in fact intentionally circumvented Cornell's own Policies, to deprive Plaintiff of a hearing on the Complaints or Cross-Complaints filed under the Code of Conduct and Policy 6.4.

330.    Despite informing Plaintiff on multiple occasions that a hearing would be held on the Code of Conduct complaints, at no time was Plaintiff afforded a hearing with respect to this matter, in violation of Cornell's own Policies and Plaintiff's right to a fair process.

331.    Plaintiff James Doe was consequently denied his procedural rights to have both cases heard by an impartial and objective panel, to cross-examine witnesses against him and to challenge Sally Roe's account.

## B. Failure to complete the investigation within 60 days.

332.    Cornell's Policy 6.4 guaranteed that investigations conducted pursuant to the policy were to be completed within 60 days.

333.    Here, McGrath did not even issue the Confidential Investigative Report until February 15, 2016, over 135 days after the Incident occurred.

334.   It was another two months before the Faculty Review Panel assigned to Plaintiff's Policy 6.4 case issued a decision which followed McGrath's recommendation.

335.   Yet, at no time did Defendants provide to Plaintiff an explanation of the good cause that warranted exceeding the federally imposed timeframes and Cornell's policies.

336.   Thus, Defendants violated their own Policies as well as federal law when they failed to timely complete the investigation.

**C.   Failure to Resolve the Complaints Impartially.**

337.   Cornell's Policy 6.4 provides that investigators are required to "undertake to resolve [complaints] impartially, promptly, and confidentially..."

338.   However, Defendants failed to conduct an impartial investigation when Defendants:

    a.   Imposed an interim suspension on James Doe prior to hearing his version of the events;

    b.   Treated the investigation as a prosecution when they interrogated James Doe for nearly four hours in a hostile manner;

    c.   Supported the complainant when they submitted a response to James Doe's appeal and requested that the decision of "No Action" be upheld in November 2016;

    d.   Intentionally deprived Plaintiff of the right to have his case heard before an impartial panel; and

    e.   Acted as advocates for the complainant when they vehemently opposed Plaintiff's request to overturn the temporary suspension in October 2015.

339.    Based on the foregoing, Plaintiff is entitled to recover damages for Defendant Cornell's breach of the express and/or implied contractual obligations described above.

340.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

341.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FIFTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against Cornell University)

342.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

343.    Based on the aforementioned facts and circumstances, Defendant Cornell acted in bad faith when it meted out an erroneous decision and disproportionate sanction notwithstanding the flawed investigative process and lack of evidence in support of Sally Roe's allegations of misconduct.

344.    Based on the aforementioned facts and circumstances, Defendant Cornell breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

345.    As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

346.   Plaintiff is entitled to recover damages for Defendant Cornell's breach of the express and/or implied contractual obligations described above.

347.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

348.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SIXTH CAUSE OF ACTION
#### Negligence (Against All Defendants)

349.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

350.   Defendants owed a duty of care to Plaintiff, arising from the obligations delineated in Cornell's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights. Such duties included, without limitation, a duty of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; a duty of care to conduct an impartial, timely and thorough investigation of the allegations of sexual misconduct against him; and a duty of care to utilize the preponderance of the evidence standard in reaching a determination.

351.   Based on the foregoing, Defendants breached their duties owed to Plaintiff.

352.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

353.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Promissory Estoppel (Against Cornell University)

354.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

355.    Cornell's Policies constitute unambiguous representations and promises that Cornell should have reasonably expected to induce action or forbearance on the part of Plaintiff.

356.    Cornell expected or should have expected Plaintiff to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Campus Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

357.    Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Cornell, by choosing to attend Cornell rather than other schools of equal caliber and schools which offered him substantial scholarships and academic advantages.

358.    These express and implied promises and representations made by Cornell must be enforced to prevent substantial injustice to Plaintiff.

359.    Based on the foregoing, Cornell is liable to Plaintiff based on Promissory Estoppel.

360.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages,

loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

361.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## DECLARATORY JUDGMENT

362.    By reason of the foregoing, Plaintiff James Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Cornell violated New York State Education Law § 6444(5); (ii) the outcome and findings made against Plaintiff by Cornell be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) all records related to Plaintiff's suspension and probation from Cornell be removed from his education file; (vi) any record of the complaints filed against Plaintiff be permanently destroyed; and (vii) Cornell's rules, regulations and guidelines applicable at the time of Plaintiff's case are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff James Doe demands judgment against Defendants as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for a violation of the Fourteenth Amendment Procedural Due Process, a judgment awarding Plaintiff damages in an amount to be

determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for violation of the New York Education Law Article 129-B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action for promissory estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(viii)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff James Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated:   New York, New York**
**        April 11, 2017**

NESENOFF & MILTENBERG, LLP

By: _____

Andrew T. Miltenberg, Esq. (517014)
Tara J. Davis, Esq. (519928)
    363 Seventh Avenue, Fifth Floor
    New York, New York 10001
    (212) 736-4500
    amiltenberg@nmllplaw.com
    tdavis@nmllplaw.com

SHAW & MURPHY, PLLC

By: _____/S/_____

William R. Shaw, Esq. (102589)
109 East Seneca Street
Ithaca, New York 14850
wrs.shawlaw@verizon.net